**STATE OF FLORIDA et al., Plaintiffs,**

v.

**F. David MATHEWS, et al., Defendants.**

Civ. A. No. 2173–73.

United States District Court,
District of Columbia.

July 20, 1976.

Charles A. Miller, Washington, D. C., Malachy R. Murphy, Deputy Atty. Gen. of Washington, Olympia, Wash., Philip L. McCormick, James B. McCabe, Cummings & Durkan, Seattle, Wash., for plaintiffs.

John T. Boese, Dept. of Justice, Christopher Hagen, Dept. of Health, Education & Welfare, Washington, D. C., for defendants.

FINDINGS OF FACT

AUBREY E. ROBINSON, Jr., District Judge.

INTRODUCTION

1. This is an action for declaratory and injunctive relief brought by 13 states against the Secretary of the United States Department of Health, Education and Welfare (HEW) and the Administrator of HEW's Social and Rehabilitation Service (SRS). It challenges certain portions of a memorandum issued by the then Administrator of SRA, John D. Twiname, on December 20, 1972 (Twiname memorandum).

2. The Twiname memorandum sets forth criteria for determining the allowability of state claims for federal financial participation (FFP) in expenditures for social services under various titles of the Social Security Act. The criteria have been and are being used for this purpose. They are applicable to claims covering periods at least through September 30, 1975.

3. The Twiname memorandum is organized under seven "issues," each of which contain one or more questions and the answers thereto. The complaint advanced certain contentions applicable to the Twiname memorandum as a whole, some of which were dealt with in the Court's Order of July 31, 1975, on cross motions for summary judgment. The complaint also alleged that certain portions of the Twiname memorandum (under Issues 1, 4, 5, and 7) constituted changes from past law and practice made without compliance with applicable rulemaking procedures. Defendants having conceded that the answer to Issue 7 and a portion of the answer to Issue 1 represented changes from the law and practice prior to the issuance of the Twiname memorandum, and that rulemaking procedures were not followed in connection with the memorandum, the Court's Order of July 31, 1975, granted summary judgment to plaintiffs with respect to these changes. Concerning the balance of Issue 1 and Issues 4 and 5, the Court found that there were material questions of fact as to whether the answers constituted changes from prior law and policy and on that basis denied the motions for summary judgment.

4. As to the remaining portion of Issue 1 alleged by plaintiffs to constitute a change from past law and practice, there is no live dispute between the parties since plaintiffs have not identified any facilities that are necessarily excluded from the list of facilities contained in the Twiname memorandum.

### STATUTORY AND RELATED BACKGROUND

5. Since 1935 the Social Security Act has provided for grants to the states for public assistance in the following categories: Dependent Children (Title IV); * Aged (Title I) and Blind (Title X). A Disabled category (Title XIV) was added in 1950. Title XVI, added in 1962, authorized (until January 1, 1974) a combined program of aid to the aged, blind and disabled. States desiring to participate in these programs submit Plans describing their programs which must comply with federal requirements and are subject to approval of the HEW Secretary.

6. In 1956 the Act was amended to provide for grants at the 50 percent matching rate for social services provided by the state welfare agency to persons in the above-described categories.

7. In 1962 the Act was amended to provide, *inter alia*, that:

(a) the Secretary of HEW prescribe "mandatory" services and specify "optional" services for which states would receive federal funds at the 75 percent matching rate provided that all mandatory services were provided. If all mandatory services were not provided, services could still be matched at the 50 percent rate;

(b) services could be provided, at the states' option, to persons who had been or were likely to become recipients of financial assistance (these will hereafter be referred to as the "former" and "potential" categories);

(c) states could enter into agreements with other public agencies (generally referred to as purchase of service arrangements) to provide social services pursuant to the state's State Plan for services;

(d) in the Title IV-A program, programs of service were to be undertaken for children in families receiving AFDC financial assistance.

8. In 1967 (by law signed on January 2, 1968) the Act was further amended as follows:

(a) in Title IV-A, the provision of mandatory services was made a condition to receiving any federal matching funds under Title IV-A, for financial assistance as well as social services;

(b) the authorization to enter into purchase arrangements was broadened to in-

---

* This program is now called Aid to Families with Dependent Children (AFDC) and is contained in Title IV-A.

clude private non-profit providers of services;

(c) programs of service were to be undertaken for or on behalf of all members of AFDC families.

9. In 1972 the Act was further amended, effective January 1, 1974, to transfer all social services provisions applicable to the aged, blind and disabled categories to Title VI (coincident with establishment of the Supplemental Security Income program of financial assistance to these categories). In 1974, the Act was further amended, effective October 1, 1975, to eliminate the social services provisions from Titles IV–A and VI and replace them with a new and substantially revised Title XX.

10. On January 28, 1969, HEW published Part 220 of its regulations applicable to the Title IV service programs. Part 220 is divided into four subparts. The first three are relevant to this case and cover Mandatory Provisions (subpart A), Optional Provisions (subpart B), and Federal Financial Participation (subpart C).

11. Also on January 28, 1969, HEW issued Part 226 of the regulations, applicable to the Purchase of Services Under Public Assistance Programs.

12. On November 26, 1970, HEW issued Part 222 of the regulations, applicable to service programs for the adult categories. Part 222 is divided into five subparts: Mandatory Provisions for All Service Programs (subpart A); Additional Mandatory Provisions for Federal Financial Participation at 75 Percent (subpart B); Optional Provisions and Services (subpart C); Definitions (subpart D); and Federal Financial Participation (subpart E).

13. The regulations in Parts 220, 222 and 226 generally remained in effect from their adoption until October 1, 1975.

### HEW ORGANIZATION AND RESPONSIBILITIES

14. In 1967 SRS was established within HEW to be responsible for the administration of all public assistance programs under the Social Security Act. The first Adminis-

trator of SRS was Mary E. Switzer who served until 1970. She was succeeded by John D. Twiname who served until early 1973. In 1969 the Community Services Administration (CSA) was established within SRS to be responsible for administration of the services programs under the public assistance titles.

15. HEW has ten regional offices located throughout the country. Each office contains a Regional Commissioner whose responsibilities cover all programs administered by SRS. The Secretary of HEW has delegated to Regional Commissioners the authority to approve (but not disapprove) State Plans and amendments thereto under the public assistance titles upon finding that they satisfy the requirements of the statute and the implementing regulations. In discharging this function, the Regional Commissioners exercise the broad discretion committed to the Secretary under the Act to act on State Plan submissions.

### ADMINISTRATION OF THE SERVICES PROGRAM, 1967–1972

16. The 1967 amendments to the Social Security Act enhanced the opportunity for states, with federal financial support, to strengthen and improve the extent, quality and variety of their service programs, particularly through more effective use of the resources of public and private agencies in addition to the welfare agency. They also afford the opportunity for experimentation and innovation in the methods of service delivery.

17. Following his appointment as CSA Commissioner in 1969, and acting pursuant to directions of the Secretary, Under Secretary and Administrator of SRS, Stephen P. Simonds encouraged states to expand their social services programs consistent with the broadened authorities in the Social Security Act. He emphasized the opportunity to utilize purchase arrangements with other public and private agencies and to extend services to persons in the "former" and "potential" categories, streamlining service delivery in order to bring a broader compliment of services to a greater number of

people in the categories covered by the Social Security Act, separating eligibility determinations in financial assistance from service delivery, and consolidating service delivery programs.

18. In response to the 1967 amendments to the Act, the subsequently issued regulations, and the encouragement of CSA officials, a number of states submitted amendments to their Plans to broaden their service programs, particularly through greater utilization of the services available from other agencies and the extension of services to the former and potential categories.

19. In the spring of 1971, it was decided within HEW to issue a policy statement enunciating the opportunities under the amended statute for expanding services programs through purchase of services from other agencies. A statement was issued under Mr. Simonds' signature dated June 17, 1971 (Simonds memorandum) to Regional Commissioners for use as a basis for negotiations with state agencies and evaluation of state plans and for other purposes.

20. James A. Bax succeeded Mr. Simonds as CSA Commissioner coincident with the issuance of the Simonds memorandum. Thereafter, acting pursuant to direction of the Secretary, Under Secretary, and Administrator, Mr. Bax actively encouraged states to expend their services programs, particularly by greater emphasis on new services and new providers.

21. In the several months following issuance of the Simonds memorandum, a number of additional states submitted Plan amendments to broaden their services programs, particularly through the use of services provided by other agencies and the extension of service to the former and potential categories. In a number of instances, several months or longer elapsed between the time of submission of the plan amendments and their approval by Regional Commissioners.

22. State claims for federal financial participation in social services expenditures increased following the 1967 amendments and the implementing regulations. In fiscal year 1970 total social services payments by the federal government were budgeted to be $551,620,000; for fiscal year 1973 the budgeted amount had increased to approximately $1.3 billion. Later estimates indicated that the federal share for 1973 and later years would be substantially greater.

23. Until 1972, there had been no dollar limit on the authorizations in the Social Security Act to match state expenditures for social services. In the State and Local Fiscal Assistance Act of 1972 (commonly known as the Revenue Sharing Act) enacted on October 20, 1972, the Social Security Act was amended to provide a $2.5 billion ceiling on federal expenditures for social services annually beginning July 1, 1972, with each state allotted a maximum share based on its population.

### PROGRAM REQUIREMENTS PRIOR TO THE TWINAME MEMORANDUM

24. For many years the principal source of interpretation and guidance on the public assistance programs under the Social Security Act was the Handbook of Public Assistance Administration. This was a several volume collection of requirements, suggestions and discussions on various aspects of public assistance administration which was modified frequently. Beginning in 1969 HEW began codifying portions of the Handbook in the Code of Federal Regulations. The published regulations superseded the Handbook in areas in which there was overlap. The regulations for the services programs were codified in Parts 220, 222, 226 and 205.

25. The Handbook contained extensive discussion of the eligibility determinations process. Published regulations dealt in considerable detail with the eligibility determination process. Nothing in the Handbook, the published regulations or any other official source prior to the Twiname memorandum specified requirements as to the timing of the determination of eligibility for social services. Neither the Handbook nor the published regulations prohibited the use of sampling or other statistical techniques for determining eligibility for services.

26. On various occasions central office or regional office personnel prepared summaries of federal requirements for services programs which covered the eligibility determination process. In none of these summaries did the Twiname memorandum eligibility determination requirements appear.

27. Sampling is a widely accepted methodology used in various contexts in the public assistance programs. For example, it has long been an accepted method in developing cost allocation systems used in claims for federal participation in social service expenditures. It has been used in audits and in program reviews. It was used in connection with the "declaration" method for determining eligibility for financial assistance which, for several years, HEW required the states to employ. It is utilized in the quality control program in AFDC financial assistance.

28. In the Simonds memorandum issued June 17, 1971, the CSA Commissioner advised states and regional officials that sampling to determine eligibility was one approach to streamlining service delivery that was permissible under the federal program.

29. A memorandum was sent to regional Commissioners from the Acting Commissioner of CSA dated August 11, 1972, which for the first time advised that statistical procedures for determining eligibility for social services (such as sampling) was impermissible and that individual eligibility determinations were required in each case. This memorandum was withdrawn four days later by Michio Suzuki, Acting Assistant Commissioner for Program Management of CSA, acting on instructions from the office of the Secretary. In oral advice to all regional offices and by written confirming memorandum to a long list of HEW personnel, Mr. Suzuki advised that the memorandum of August 11 was not to be used in any form or fashion, that its contents were not to be shared with anyone, and that no directions, discussion or interpretations were to be based on the August 11 memorandum. The August 11 memorandum was withdrawn because HEW did not want at that time to impose any significant new restrictions on the states in the administration of their services programs.

30. On September 29, 1972, a memorandum was distributed to states in HEW Region I from the regional office setting forth the prohibition on the use of statistical procedures to determine eligibility in the same words as were contained in the withdrawn August 11 memorandum. No other region distributed a similar memorandum. The Region I memorandum conflicted with the withdrawal of the August 11 memorandum and was vigorously protested by states in Region I.

31. There was a service plan concept in the federal social services program for many years. No specific format or definition of a service plan was provided by HEW and state practices concerning service planning varied widely. The concept of a service plan involves the identification of a goal to be achieved by the provision of service to a person with a problem. There need be no single document or series of discrete documents establishing a service plan, although this is not precluded. There need be no social study, as had been commonly employed in the past and which some states continued to utilize for current AFDC cases. A service plan is often inferred from a course of dealings between the recipient and the service worker or provider. A service plan was to aid in identifying the services needed by a recipient and to facilitate the provision of those services. It is a technique for expanding service delivery.

32. The subject of service plans for recipients of social services is covered in the published regulations. Section 220.16 provides for the preparation of service plans for each family and child who requires service. For those in the financial assistance caseload on or before March 31, 1969, a plan was required to be developed by January 1, 1970, to be maintained on a continuous basis, and to be reviewed as often as necessary but at least annually. For those added to the financial assistance caseload after March 31, 1969, the plan was required with-

in one year of approval for financial assistance.

33. Section 220.16 implements the requirement of section 402(a)(14) of the Social Security Act. It is among the regulations grouped under the heading "Mandatory Services Applicable to Title IV, Part A" which comes under Subpart A–Mandatory Provisions. It is applicable only to current recipients of financial assistance. There are no service plan provisions in the regulations applicable to service recipients in the former and potential categories. This understanding of the legal scope of the regulations was communicated to state officials through regional officials by the chief of the policy division within CSA responsible for the interpretation of Title IV–A program requirements.

34. Section 222.22 provides for the assessment of individuals' service needs and implementation of individual service plans in all cases where service is needed. These plans must be reviewed as often as necessary but at least annually. Each service plan and the services provided must be recorded. It is among the regulations which come under Subpart B–Additional Mandatory Provisions for Federal Financial Participation at 75 Percent. It need not be complied with in order for a state to receive federal financial participation in services to eligible adults, but must be met in order for a state to obtain federal participation at the 75 percent matching rate.

35. There was never a requirement that federal financial participation be limited to services specified in a service plan, or that a service plan be written before the service is provided. There was no requirement that the service planning process be evidenced in the case record separately from the record documenting the service provided. Such a requirement would have been exceptionally burdensome, would have delayed the delivery of service, could have compromised the integrity of social workers, and would have been inconsistent with the CSA goals of program simplification and expeditious delivery of services to the needy. The record reflects no instance prior to the Twiname

memorandum in which a state was denied or threatened with denial of federal participation in services funding because of the failure to meet service plan requirements.

36. The published regulations applicable to General Administration of the Public Assistance Programs (Part 205) contain provisions on fiscal policies and accountability and on cost allocation. These regulations have never contained a requirement that accounting and costing systems be in effect during the quarter of which a claim is rendered in order for a state to qualify for federal financial participation in that quarter. They have never contained a requirement that cost allocations applicable to any particular quarter be based on data from that quarter.

37. In April 1969 Guides on Federal Regulations Covering Service Programs under Title IV–A were published to assure a common understanding by federal, state and local agencies of the purpose, scope and meaning of the regulations, the expectations of the states, and the options open to them; to express some SRS recommendations for program administration; and to assist states in planning their service programs. These Guides constitute a comprehensive statement of federal requirements for services programs. They neither contain nor suggest the Twiname memorandum requirements on eligibility determination, service plans or accounting methods. The discussion of service plans in the Guides emphasize that they relate to the overall service objectives of the 1967 Social Security Act service amendments. The Guides urge but do not require states to develop service plans earlier than one year after acceptance of a family for financial assistance as specified in the published regulation. They stress that states may undertake a "much broader service program than the minimum prescribed by the Federal policies."

38. There has always been a "statewideness" principle in the Social Security Act applicable to public assistance programs. It requires that programs be in effect on a

statewide basis in order to qualify for federal funding, although this does not mean that the same service must be afforded in all parts of a state if different or variant services are more appropriate for particular parts. In the service context, a state satisfied the statewideness requirement if it was moving toward statewide operation of its plan. The statement in section 201.3(g) of the regulations that the effective date of a new plan may not be earlier than the first day on which the plan is in operation on a statewide basis is intended to express the statewideness concept. It was never understood to incorporate the criteria of the Twiname memorandum, Issues 4 and 5.

39. Social services could be provided pursuant to agreement with other state agencies or pursuant to contract with local public or nonprofit private agencies when the state welfare agency determined that the services could not be as economically or effectively provided by its staff (or the local welfare agency staff) and that the services are not otherwise reasonably available to individuals in need of them. Federal funding for these services was available from the first day of the quarter in which an agreement is made.

40. A state plan or amendment thereto took effect on the date specified in the approval action, which could be as early as the first day of the calendar quarter in which an approvable plan or amendment was submitted. Once a plan or amendment was approved, claims for expenditures thereunder were honored back to the effective date. If a state did not submit its claims for services rendered on a current basis, because its plan was not yet approved or for other lawful reasons, it was permitted to submit claims on a retroactive basis. This could be based on accounting methods developed subsequent to the provision of the service.

41. Prior to the Twiname memorandum, a state qualified for federal financial participation in services expenditures if eligible services were provided to eligible persons as described in the approved state plan.

## EVENTS PRECEDING THE TWINAME MEMORANDUM

42. In 1971 there was established within SRS an Office of Financial Management (OFM). Mr. Frank DeGeorge was appointed the Assistant Administrator for Financial Management with responsibility for OFM. The Division of State Grant Administration was established within OFM in June 1972 with responsibility for administering state grants and assisting regional offices in reviewing state claims. Randolph W. Lee, who formerly had been special assistant to Mr. DeGeorge, was appointed Director of the Division of State Grants Administration.

43. By Mid-1972 fiscal and program officials within HEW had become aware that states had made or were in the process of submitting claims for federal funds for social services in amounts substantially greater than had theretofore been claimed. Some of these officials, including Mr. DeGeorge, Mr. Lee, and Mr. Carl Chafin, a fiscal and financial management official in CSA, were concerned about the potential liability of HEW for the amounts claimed.

44. During 1972 a number of questions concerning the federal social services regulations were presented by some regional officials to the HEW central office. The use of sampling to determine eligibility was among the matters raised. No questions concerning the timing of eligibility or the meaning of the service plan regulations had been raised.

45. In the fall of 1972, following a meeting of Mr. DeGeorge with other senior SRS officials, Mr. Lee was instructed by Mr. DeGeorge to prepare a draft of a series of answers to questions that set forth criteria applicable to state claims for social services funds. Mr. Lee was assisted by Mr. Chafin. Neither Mr. Lee nor Mr. Chafin was experienced in program aspects of social services. Regional officials did not participate in the preparation of the criteria. After the criteria were drafted they were approved by senior SRS central office officials, including Mr. DeGeorge. The criteria included the questions and answers subsequently con-

tained in Issues 4 and 5 of the Twiname memorandum. It was expected that these criteria would disqualify the bulk of the state retroactive service claims.

46. In the course of drafting the questions and answers Mr. Lee and Mr. Chafin researched HEW files and reviewed legal and interpretive materials in order to find support for the interpretations subsequently contained in the Twiname memorandum, including Issues 4 and 5. They did not discover any material that set out the "prior eligibility" requirement or other requirements in Issues 4 and 5.

47. In early November 1972, HEW officials held meetings with officials of the States of Minnesota and Massachusetts to discuss the subject of federal financial participation in social services expenditures by those states under their amended State Plans. Joan Hutchinson, then on the staff of the Commissioner of CSA, was the spokeswoman for HEW at the meeting with Massachusetts officials on November 10, 1972.

48. At these meetings, the criteria contained in Issues 4 and 5 of the Twiname memorandum were enunciated by HEW officials as the governing policy applicable to claims for social services funds. The record does not contain evidence as to the reaction of the Minnesota officials. The Massachusetts officials, particularly Steven Minter, then Commissioner of Welfare in Massachusetts, protested these criteria, questioned whether they had any basis in previously published regulations, policy memoranda, or other official issuances, and asked to be shown documentation to support the requirements.

49. Following the Massachusetts meeting, Ms. Hutchinson requested that CSA develop a file of previously issued program instructions and policy memoranda containing the policy enunciated at the Massachusetts meeting, including that relating to the timing of eligibility determination and the timing and nature of service plans.

50. CSA officials were unable to locate any material setting forth or otherwise supporting the policies referred to by Ms. Hutchinson. Thereafter, it was decided that a document should be issued containing the policy criteria that had been enunciated at the Massachusetts and Minnesota meeting, including the criteria on eligibility determinations, service plans, and accounting methods. This was done by the issuance of the Twiname memorandum on December 20, 1972.

## THE REQUIREMENTS OF THE TWINAME MEMORANDUM ISSUES 4 AND 5

51. Those who drafted the Twiname memorandum attempted to address the issues presented by the new claims and questions from the regional offices in a manner consistent with the law, the regulations and prior interpretations of procedures for the delivery of federally funded social services. The positions set forth in the memorandum are discussed with and approved by the legal, programmatic and management branches of HEW.

52. Issue 4 of the Twiname memorandum purports to set forth criteria to determine when a provision of a state plan is "in operation." Unless the criteria are generally being met during the period of a state claim for federal funds, the intent of the memorandum is that the claim should be denied. Issue 5 specifically precludes federal funding based on retroactive claims where the Issue 4 criteria have not been satisfied. The memorandum has been applied in accordance with its terms in processing state claims.

53. Issue 4, requires for a state claim for social services funds to be allowable, that the eligibility of recipients for services rendered on an individual basis be determined at, or prior to, the time of service delivery except in cases of emergency. (Issues 4 and 5 of the Twiname memorandum apply only to services provided on an individual basis and not to services provided on a group basis). An eligibility determination is a process of taking information, verifying information, and making a decision concerning the applicants entitlement to federally

funded social services. Defendant's position at trial that the requirement of Issue 4 would be satisfied if the eligibility determination process had been commenced prior to the commencement of service is inconsistent with the terms of Issue 4 that eligibility be "determined" at or prior to delivery of service and with the Issue 5, Point 1 requirements. This position is also inconsistent with application of the memorandum which has been to preclude federal funding where the eligibility process had not been completed before service was commenced.

54. For retroactive claims (a claim submitted for a quarter other than the current quarter covered by an expenditure report), Issue 4 of the Twiname memorandum states that sampling techniques or any other method of reconstruction may not be used to determine eligibility of service recipients on a retrospective basis. This provision is intended to bar claims for federal funds where eligibility of service recipients has been determined in any manner other than on an individual basis "at or prior to" delivery of service.

55. Issue 4 sets forth the further requirement that there be individual service plans for each recipient of service provided on an individual basis, that they be developed and maintained on a current basis, that there be a record that services were provided or arranged for pursuant to the service plan, and that there be a means of determining that the services provided were prescribed by the service plan. Issue 5 states that service plans may not be constructed "after the fact." It was intended that these requirements apply to all categories of service recipients (current, former or potential), that the required service plans be written, that they prescribe any service rendered for which federal funding is sought, and that they be prepared prior to the delivery of service (at least those portions that prescribe the service in question).

56. Issue 4 sets forth the further requirement that an established and adequate system of accounting and costing must be in effect along with the maintenance of supporting fiscal records. Issue 5 provides

that accounting methods may not be constructed "after the fact." Taken together, these portions of the Twiname memorandum appear intended to establish the requirement that the accounting methods (including cost allocation systems) on which a claim for FFP is based must have been in effect during the period to which the claim relates—*i. e.,* when the services were provided.

## EXPERIENCE WITH STATE SERVICE PROGRAMS BEFORE AND AFTER THE TWINAME MEMORANDUM

57. *Connecticut.* In September 1970 Connecticut submitted amendments to its service plans to cover a variety of children's services provided to former and potential as well as current AFDC recipients. The amendment was subsequently approved effective July 1, 1970. Thereafter, in 1972, Connecticut developed accounting systems and methods for determining eligible recipients and eligible services as the basis for claims for federal funds for these services retroactive to July 1, 1970. Retroactive claims were submitted based on these systems and methods and they were paid by HEW.

58. Regional HEW officials also worked with Connecticut in 1972 in developing another retroactive claim for services funds back to July 1, 1969, for services performed by the Circuit Court and Central Collections Division. Regional officials advised that the retroactive claim could be developed and submitted subject to removal of a compliance issue.

59. In 1971, the Connecticut Plan was further amended to cover day care services provided by another state agency to children in the former and potential categories. The amendment was approved effective April 1, 1971. Eligibility determinations were not made prior to provision of service to children in these categories nor were service plans developed for them.

60. In late 1971, Connecticut submitted further amendments to its state plan to be effective October 1, 1971, and to expand its service programs by covering a number of

additional services to be provided by other state and private agencies to recipients in the current, former and potential categories. These amendments were under discussion with the regional HEW office for several months prior to their approval in November 1972. The regional office was aware that Connecticut intended to submit a claim retroactive to October 1, 1971, once the amendments were approved. It advised that the state should clarify the allocation methods to be followed in developing the retroactive claim. Thereafter, Connecticut submitted material disclosing, *inter alia,* its intention to utilize sampling methods for determining eligibility in some cases. This material was reviewed by Joseph Kane, an experienced regional official with expertise in allocation and claim methodology matters in August 1972. Mr. Kane subsequently reported favorably on Connecticut's claiming methodology, which included the sampling approach and the use of data from specified periods as the basis for allocating reimbursable expenditures in earlier periods. At no time prior to the Region I memorandum of September 29, 1972 (see Finding 31), did any HEW official suggest or indicate to any Connecticut official that the sampling methodology could not be utilized in developing Connecticut's retroactive claim under its plan amendments.

61. *Massachusetts.* The Massachusetts state plan for social services was primarily limited to recipients in the current recipient category prior to October 1971. In the fall of 1971, Massachusetts advised the HEW regional office of its intent to broaden its plan significantly as part of an effort to expand substantially the state's services program. After numerous discussions in which the state sought advice on the conditions that had to be met for federal funding in the expanded program, the state submitted plan amendments for effectiveness October 1, 1971. The amendments broadened the plan generally to former and potential recipients and added a number of services not previously covered, many of which were to be provided by other public agencies.

62. The submission of the Massachusetts amendments was followed by considerable discussion and correspondence between state and regional office officials. Massachusetts submitted material setting forth the developing claims under its amendments. This material was also the subject of considerable discussion between state and regional officials in the ensuing several months as the state emphasized the importance of obtaining agreement on the methodology before undertaking to submit claims for federal funds.

63. Among the methodologies proposed by Massachusetts was the use of sampling methods for determining recipient eligibility in certain circumstances. This matter was the subject of frequent discussion between state and regional officials, and was referred to the central office for advice. In mid-1972 regional officials told state officials that they would be unable to provide definitive advice on the state's proposed sampling methodology because there were no existing standards and suggested that the state proceed in whatever manner it deemed best.

64. By letter dated June 30, 1972, portions of the Massachusetts plan amendments were approved for effectiveness back to October 1, 1971, subject to working out technical matters. After further discussions over the following several months, on November 7, 1972, the regional office approved other portions.

65. In late September 1972 the regional office informed Massachusetts that sampling could not be utilized to determine eligibility. Mr. Minter, the State Commissioner of Welfare who had been involved throughout the plan amendment discussions, was shocked by this advice, challenged its basis, and requested a meeting which was held on November 10, 1972. (The meeting is described in Findings Nos. 47 and 48.) Thereafter, in January 1973, the regional office informed Massachusetts that sampling was prohibited and could not be utilized.

66. The regional office had informed Massachusetts that claims for federal funds

under the plan amendments could not be submitted or honored until the amendments were approved. Following the June 30, 1972, approval certain funds were paid to Massachusetts pursuant to the amendments. Regional officials were aware from the earliest stages of dealings on the Massachusetts plan amendments that claims retroactive to October 1, 1971, would be submitted by the state once the amendments were approved, and that the claims would be based on methodologies that were being developed by Massachusetts in conjunction with the regional office during 1972. Regional officials assured Massachusetts that this could be done, after first checking with the central office of HEW.

67. Subsequent to the acceptance of the plan amendment material in November 1972, Massachusetts submitted claims for federal participation in expenditures incurred by the state in providing services described in the amendments to persons determined to be eligible by use of sampling techniques under the amendments. These claims were submitted subsequent to the issuance of the Twiname memorandum. Substantial portions of the claims have been denied on the basis of failure to comply with the requirements contained in Issues 4 and 5 of the Twiname memorandum.

68. *Rhode Island.* Prior to October 1971, the Rhode Island plan for social services did not provide for service for former or potential recipients. In the last quarter of the year 1971, Rhode Island submitted amendments to its state plan to broaden the services provided and to include the former and potential categories in the plan. This was part of an effort by Rhode Island substantially to expand services available to needy people in the state. These amendments were approved by the Regional Commissioner.

69. Rhode Island also submitted plan amendment material setting forth the methodology it would follow in submitting claims under its amendments. This methodology, worked out during the first half of 1972 with the help of regional HEW officials, included the determination of eligibili-

ty on a sampling basis for certain of the services newly covered by the plan. A one-day sample of juvenile probation and parole cases in March 1972 would be the basis for determining an eligibility percentage for the period from October 1, 1971, to June 30, 1972. A sampling of the cases over a three and one-half month period would be the basis for determining an eligibility percentage for the period November 15, 1971, to June 30, 1972, for a newly established child care institution. This methodology was formally approved by the Regional Commissioner in July 1972. Claims were submitted pursuant to the methodology back to October 1, 1971, and were paid.

70. The approval of the Rhode Island methodology described above covered the period through June 30, 1972. Thereafter, Rhode Island submitted plan amendment material setting forth the identical methodology for determining eligibility for the same services during the next fiscal year, and closely analogous methodology for use in connection with additional services. In February 1973, the regional office informed Rhode Island that these methodologies were not acceptable. Claims submitted pursuant to these methodologies have not been honored.

71. *New York.* The New York state plan for several years prior to 1972 covered services to persons in the former and potential categories. During this period, it was the practice of New York to make eligibility determinations for recipients either before or after delivery of service. Service plans were utilized only in cases involving extensive service.

72. In 1969, New York's state plan for services was rewritten and was approved effective April 1, 1969. Among other things, this plan covered day care services. By 1971, the state realized that day care services originally thought to come under another non-federal program would qualify under the state plan for federal funding to the extent provided to federally eligible persons. New York thereupon undertook to determine the extent to which these day care services had been provided to federally

eligible persons since April 1969 and submitted a retroactive claim for federal funding for day care services to persons so identified. The regional office was aware of the procedure followed by New York and it honored New York's retroactive claim.

73. In 1971 New York state law was amended to authorize the state welfare agency to administer an enlarged program of centers for the elderly throughout the state. New York then amended its state plan to cover these services. The amendment was approved in October 1971, effective January 1, 1971. New York proposed to determine eligibility of the recipients of service in the centers through a sampling method. The regional office was asked in May 1971 to approve this method and did so in June 1971 after clearance with the central office. The method involved sampling a portion of users of the centers periodically with the results of the sample to provide the eligibility percentage for a six-month period. New York submitted detailed plans for implementing this sampling method which were formally approved by the regional office. The method was applied to retroactive claims and for current period claims. These claims were honored.

74. *Virginia.* Prior to September 1972, the Virginia state plan did not provide for services to former and potential recipients except for persons currently eligible for medicaid. In the administration of its service program it did not require that service plans be undertaken for recipients before services were provided under the federal program (so long as service plans for current recipients were completed within the one-year period prescribed by the federal regulations).

75. *Florida.* The Florida state plan for services was amended effective January 1, 1971, to add the categories of former and potential recipients and to add some new services. It was further amended effective July 1, 1971, to broaden further the services covered by the plan. These amendments were approved by the regional office and served as the basis for substantial expansion of Florida's services program.

76. Florida worked out with the regional HEW office a method for determining eligibility of recipients of services from the Division of Youth Services in the first six months of 1971 by which the eligibility percentage for recipients in June 1971 was ascertained and applied to the entire six-month period. Claims submitted pursuant to this method were honored. Subsequent to the issuance of the Twiname memorandum, the claims for the first six months of 1971 were subject to review and the Division of Youth Services claim for the months of January-May was disallowed on the grounds that the sampling method for determining eligibility was impermissible.

77. For the last half of 1971, Florida and the regional office agreed that eligibility for services provided by other divisions within the Department of Health and Rehabilitative Services would be determined on a sampling basis by projecting the eligibility percentage derived from a random sample of 5 percent of the caseload for a single month to the entire six-month period. Claims so submitted were honored.

78. Beginning in February 1972, Florida undertook to determine eligibility on an individual basis. The eligibility percentage so obtained for February was used as the basis for the January 1972 claim with regional office knowledge and the claim for that month was paid. Florida decided to utilize individual eligibility determinations because they provided closer fiscal controls for state budget purposes. However, Florida did not require that the determinations be made prior to delivery of service.

79. Florida utilizes service plans for all service recipients whether or not they were eligible for federal reimbursement as a matter of state policy. For persons served by divisions of the Department of Health and Rehabilitative Services other than the division responsible for financial assistance (*i. e.,* formers and potentials), the service plan is simply a check-off of services rendered. There is no time limit on completing the plan except that it be completed by the time the claim for federal reimbursement is filed.

80. The accounting methodology to be utilized by Florida for claims under its July 1971 plan amendments was developed over a several-month period of discussions between state and regional officials. Final agreement on the methodology was reached in 1972. Thereafter, Florida computed its claims pursuant to this methodology retroactive to July 1971. These claims were honored by the regional office.

81. *South Carolina.* South Carolina amended its state plan for services effective April 1, 1972, to add services provided by other public and private agencies in the state. In June 1972 the Regional Commissioner informed the state that sampling could be used to determine eligibility for the fourth quarter of fiscal year 1972 (April-June). Thereafter, the state proposed methodologies for claims pursuant to these plan amendments. These included proposed sampling methods for determining eligibility for the fourth quarter of fiscal year 1972. The regional office suggested revisions in the methodologies, including the methods for sampling to determine eligibility, which were accepted by the state. Claims were thereafter submitted pursuant to this methodology retroactive to April 1, 1972.

82. In January 1973, the regional office advised South Carolina that because of the Twiname memorandum, Issues 4 and 5, its retroactive claims could not be honored.

83. *Mississippi.* Prior to 1972, Mississippi had a social services program at a very modest spending level. In April 1972 the state was strongly encouraged by federal officials to expand its program in order to build a larger base in the event of a subsequent ceiling on federal financial support based on existing programs levels. State agencies were advised and asked to develop new service programs. Hundreds of millions of dollars of new programs were proposed and the state welfare agency actually made contracts for some $120 million per year in new services by fall 1972, requiring expenditure of $37 million in new state funds.

84. After Congress adopted the $2.5 billion ceiling on annual services funding with allocations to each state based on population, Mississippi reduced its contracts for new services drastically. Its actual expenditures in the last six months of 1972 were far less than the amounts estimated and the grants awarded to the state by HEW, though still higher than in the previous quarters. However, this required no reimbursement to HEW, for it was Mississippi's practice not to draw granted funds until they were actually expended.

85. *Wisconsin.* Wisconsin has traditionally required service plans for all recipients of state social services, whether or not eligible for federal reimbursement. The plans are designed to identify the problem to be met and the goal of the plan and to record progress made through services. A plan was not required to be prepared before service could be rendered.

86. Wisconsin's state plan covered services to current, former and potential recipients from 1962. A rewritten plan approved by HEW in 1970, effective April 1, 1969, covered services in institutional settings. Wisconsin sought federal funding for certain services falling within the general plan descriptions, including services to youths in juvenile rehabilitation institutions and to persons in mental health facilities or community mental health clinics. The regional office declined to honor these claims on the grounds that the services were not eligible for federal funding. Wisconsin nevertheless provided the services through its own funds and expanded the volume of services provided.

87. In 1971, Wisconsin learned that another state in the same region (Illinois) was receiving federal funding for services similar to those for which it had been denied funding. It thereupon informed the regional office of its intention to submit a retroactive claim for federal funding for the services previously provided from April 1969 through September 1971. It also began claiming federal funds for these services on a current basis. A national accounting firm was retained to assist in reconstructing the

retroactive claims. Discussions over a several-month period were held with regional officials. One of the subjects proposed by Wisconsin was the use of sampling methods for determining eligibility. Throughout the first eight months of 1972 the regional office told Wisconsin that it had referred this question to the central office for advice and had not yet received a response.

88. On September 29, 1972, the Regional Commissioner responded in writing to Wisconsin's proposed methodology for its retroactive claim. Concerning eligibility determinations, the letter did not accept Wisconsin's proposed methodology but proposed another method for the retroactive period based on eligibility percentages ascertained from individual eligibility determinations from October 1, 1971, forward. Other changes in the methodology for developing the retroactive claim were proposed. The use of sample data for a portion of the claim period to develop cost allocations applicable to the entire period was specifically acknowledged.

89. Wisconsin determined that some $12 million of its claim could be supported by the methodology proposed by the Regional Commissioner and it so advised the regional office. However, Wisconsin has never received any portion of its claim because of the Twiname memorandum.

90. After the Twiname memorandum was issued, the state asked for a meeting to clarify its effect on its pending claim. At the same time HEW asked Wisconsin to reconsider its claim in light of the memorandum. The meeting was held on January 26, 1973. At that time regional officials explained that the Twiname memorandum precluded acceptance of Wisconsin's pending claim. Subsequently, Wisconsin received written confirmation of this advice.

91. Regional officials told Wisconsin that its retroactive claim should have been processed in the manner being followed by the regional office, and expressed disappointment that the central office had taken a different view as evidenced by the Twiname memorandum. The Deputy Regional Commissioner responsible for Wisconsin's programs advised the Regional Commissioner that Wisconsin's retroactive claim arose as a result of erroneous advice previously given to Wisconsin by the regional office.

92. *Other Region V States.* The states of Michigan, Minnesota and Illinois submitted plan amendments during 1970 and 1971 to broaden their social services programs. Each included new services to be provided on a purchased basis by state public agencies. In each case the plan amendments were approved. Each state proposed to utilize sampling methodologies to determine eligibility of recipients of services from various of the state agencies. In the case of Illinois, the regional office with central office concurrence agreed to the use of the sampling approach, and claims, including retroactive claims, based on that method were submitted and honored. The regional office did not actually approve the sampling approach proposed by Michigan and Minnesota, although CSA Commissioner Bax advised Minnesota officials in mid-1972 that sampling to determine eligibility was appropriate and a central office representative worked with Michigan in developing its sampling plan. The use of sampling methods by these states was extensively discussed by state and regional officials over an extended period.

93. *Region VI States.* In June 1972 officials from HEW's Region VI office visited several states, including Oklahoma and Louisiana, to urge them to amend their state plans to add service provided by other public and private agencies and to expand service to the former and potential categories. The regional officials helped these states to prepare plan amendments and agreements with provider agencies before the end of June. They advised states that upon approval of the amendments federal funding would be available for eligible services provided to eligible persons, including those provided by the other public and private agencies, back to the beginning of the quarter. They further suggested that federal funding might be available back to June 1, 1971, and urged the states to submit claims on that basis. Claims were so sub-

mitted. The Louisiana claim was honored for the full retroactive year. Later the regional office disallowed the claims on the basis of the Twiname memorandum. Oklahoma's retroactive claim was honored for the fourth quarter. The claim for the previous three quarters was deferred. Subsequent to the Twiname memorandum, the claim for the full year was disallowed.

94. *Idaho.* The Idaho state plan did not provide for service to former or potential recipients prior to mid-1972. The plan was amended to so provide effective April 1, 1972, and to cover services provided by other public agencies as part of an overall expansion of the state's program. Idaho developed a methodology for claims for federal funds for services provided by other public agencies which was published and distributed in August 1972. The methodology included sampling to determine eligibility. The regional office was aware of this methodology and interposed no objection to it at the time. Claims were submitted for the period April-September 1972 based on the methodology and were paid but later disallowed on audit.

REVISION OF PUBLISHED REGULATIONS APPLICABLE TO ELIGIBILITY DETERMINATIONS AND SERVICE PLANS

95. Throughout the year 1972, SRS had under consideration comprehensive revision of the published regulations applicable to the services program. Several versions of new regulations were drafted. In November 1972, revisions of parts 220, 222 and 226 were prepared in draft form and circulated to interested groups outside HEW for comment. These draft revised regulations contained no provision concerning the determination of eligibility for services. They modified the public regulations on service plans.

96. In January 1973, subsequent to the release of the Twiname memorandum another version of revisions of the published regulations was prepared which contained major changes from the previous drafts. Among the changes added to the January draft were requirements that eligibility for services be determined prior to the provision of services, that service plans be developed for each individual receiving service under the state plan in advance of service, that no service be provided until it has been incorporated in the individual service plan, and then only to the extent and for the duration specified in the service plan.

97. On February 16, 1973, a Notice of Proposed Rule Making was published in the *Federal Register* setting forth proposed revisions in the published regulations applicable to the service programs. The proposals were contained in a new combined part 221 covering both Title IV-A and adult programs. The substantive provisions concerning determination of eligibility and service plans were the same as those contained in the January 1973 draft. There was a specific provision (proposed § 221.51) that federal financial participation be limited to those services provided in accordance with the individual service plans.

98. The Notice of Proposed Rule Making contained many major changes from the previous published regulations. These major changes were identified in an action memorandum dated February 12, 1973, from the Acting SRS Administrator to the Under Secretary of HEW, which transmitted the final draft revisions for public release and publication on February 16, 1973. The memorandum was prepared either by Michio Suzuki, Acting Assistant CSA Commissioner, or under his supervision, by a member of his staff with long experience in administering the service program. The memorandum included the new provisions on eligibility determination and service plans as among the major changes being proposed.

99. Following the receipt of comments in response to the Notice of Proposed Rule Making, final regulations were published on May 1, 1973. These regulations adopted with some revision the proposed rules on eligibility determination, including the requirement that the determination be prior to service. The proposed rules on service plans were not included in the final regula-

tion because of adverse comments from many Governors and other state officials. HEW concluded that the proposed rules were too detailed and that it was sufficient to allow states to establish their own procedures and methods of maintaining documentation to substantiate claims for federal funds.

100. The final regulations did not take effect because they were suspended by Congressional moratoria legislation. The previously published regulations remained in effect until October 1, 1975.

### FEDERAL AND STATE OFFICIALS' UNDERSTANDING OF THE APPLICABLE REQUIREMENTS

101. Stephen Simonds, the first Commissioner of CSA, has had long experience in the human services field. Prior to his federal government service, he held various positions in public health and welfare in Maine. In 1967 he became Commissioner of the Assistance Payments Administration of SRS and served as CSA Commissioner from late 1969 until June 1971. He is experienced and exceptionally knowledgeable in this field. The requirements of Issues 4 and 5 of the Twiname memorandum were not applicable during his tenure at CSA, either as requirements, policy or practice. In particular, there was no requirement that eligibility be determined at or prior to service delivery; retroactive claims for service funds were permitted. Sampling was a permissible means for determining eligibility. The service plan concept was interpreted to mean that service was to be oriented toward a goal; and the only documentation required was that sufficient to show that eligible service had been rendered to eligible people. No format for service plans was prescribed; neither a diagnostic study nor preparation of a plan prior to service delivery was required. Services did not have to be prescribed in a plan in order to qualify for federal funding.

102. During Mr. Simonds' tenure, it was not necessary for a state's accounting and costing methodology to be established at the time of delivery of services in order to qualify the services for federal funding. States were entitled to receive federal funds for eligible services to eligible persons under an approved plan from the time the services were rendered.

103. James A. Bax had been the head of the Florida Department of Health and Rehabilitation Services before becoming CSA Commissioner in June 1971. He served as Commissioner for one year. The criteria of Issues 4 and 5 of the Twiname memorandum were not applicable during Mr. Bax's tenure as CSA Commissioner and in his view they would have been inconsistent with the goals of expanded and modernized integrated services programs being pursued during that period. He approved retroactive claims, including those arising from delay in regional office approval of plan amendments, and he approved the use of sampling methods for determining eligibility.

104. Steven Minter served as Commissioner of Welfare in Massachusetts from 1970 to 1975. Prior to that time he held various positions in welfare administration in Ohio. His entire professional career until 1975 had been in public assistance. He has also served as chairman of the committee of the Council of State Administrators of the American Public Welfare Association, which was responsible for the social services area. He has appeared before Committees of Congress to testify on behalf of the Council on social services issues. He is president-elect of the American Public Welfare Association. Mr. Minter is extremely knowledgeable in this field.

105. Mr. Minter had never heard of the requirements of Issues 4 and 5 of the Twiname memorandum prior to being informed of them in November 1972 (except that he had been informed late in September 1972 of the new prohibition announced by Region I on the use of statistical procedures to determine eligibility). He never understood that eligibility had to be determined at or prior to service delivery, that service plans had to be prepared before service was delivered, or that federal funding was limited to services specified in a service plan. Mr.

Minter was astonished to learn of the new requirements and expressed vigorous opposition to them because they were unsound from a program standpoint and because they had no antecedents in HEW policy or practice.

106. States through their welfare officials vigorously protested the requirements of the Twiname memorandum, particularly those in Issues 4 and 5, in the weeks and months following the release of the memorandum. These protests included letters to regional and central office HEW officials and objections voiced in meetings. The Council of State Administrators of the American Public Welfare Association formally protested the requirements of the memorandum on behalf of most of the states, and Mr. Minter as representative of the Council voiced the objections to the memorandum in testimony and submissions to Committees of Congress.

107. Odis G. Kendrick, III, is Deputy Assistant Secretary for Administration Services in the Florida Department of Health and Rehabilitative Services. He has held several positions in the Department, and prior thereto was a Budget Analyst in the Governor's office assigned to welfare programs. In these capacities he has had extensive involvement with the federal social services program. His educational background and degree are in social work. Neither Mr. Kendrick nor other Florida welfare officials were aware of the criteria in Issues 4 and 5 of the Twiname memorandum or understood them to be requirements of federal law until being informed of them at a meeting on January 15, 1973, when they first were given copies of the memorandum. At that time Mr. Kendrick and others expressed the view that the memorandum imposed new requirements.

108. Charles Fiss is Director of the Bureau of Federal Funding for the Department of Health and Social Services in Wisconsin. Previously he was a budget official in the Department of Administration. In these capacities he has had the duty of integrating efforts to obtain federal financial support for Wisconsin's eligible serv-

ices. Mr. Fiss is knowledgeable in the requirements for federal reimbursement for services expenditures. He was not aware of the requirements of Issues 4 and 5 of the Twiname memorandum before its receipt and did not understand that these requirements had to be met to qualify for federal funding. He and other state officials discussed the memorandum at a meeting with regional HEW officials on January 29, 1973, at which time the Wisconsin officials expressed opposition to the memorandum and questioned its validity.

109. Many state officials were questioned at depositions about their knowledge of Issues 4 and 5 of the Twiname memorandum. These officials generally had broad backgrounds and experience in the social services field. One had formerly served in the HEW audit agency and for many years supervised the audits of Virginia's public assistance programs. Every one of these officials testified that the criteria contained in Issues 4 and 5 were not requirements of federal law prior to the memorandum and that they were not aware of any such federal policies prior to that time.

110. Randolph W. Lee was a budget officer in SRS from 1968 until 1972 and then Director of the State Grant Administration in OFM from 1972 to the present. His responsibilities relate to fiscal and budget matters. He has no social work background. He had no firsthand knowledge of social service program requirements at the time he drafted the Twiname memorandum. Although he undertook a review of the law, regulations and interpretations during the course of drafting the Twiname memorandum, he discovered no materials setting forth the requirements contained in Issues 4 and 5 of the memorandum.

111. Carl F. Chafin is the Director of the Budget and Financial Management Division of CSA. He has been with the CSA since early 1971. His responsibility has been in the area of fiscal policy and management administration. Prior to the issuance of the Twiname memorandum, no question concerning eligibility determinations or service plans was presented to him.

Any such questions would have been referred to program officials since they were not in his area of responsibility. He testified that the question of whether accounting systems had to be established before service was rendered had never arisen but that it was within the regional office's discretion to approve accounting methods that included allocations derived from data subsequent to the period of service to which the accounting system would be applied if the subsequent period is representative of the previous period.

112. Louis Browning, now retired, served as coordinator of policy and field liaison under Mr. Simonds and Mr. Bax for 21 months from June 1970 to March 1972. Prior to that time he held other positions in HEW but none involved the social services program and he had no significant background in child welfare. His responsibility at CSA was to coordinate responses to regions on questions of interpretation under the services program. If there was no precise precedent applicable to the question raised, his practice was to refer the question to the appropriate program division of CSA to develop a response. Mr. Browning played no role in the preparation of the regulations under the services program and was not familiar with the 1967 Amendments to the Social Security Act. It was his understanding that the prior to concurrent eligibility determination requirement (including the prohibition on sampling methods) existed before the Twiname memorandum was issued. However, he also acknowledged that no question as to the timing of eligibility determinations arose during his tenure at CSA and he was aware of no precedent setting forth the prior eligibility determination requirement. He was also unaware of any precedent on the use of sampling methods to determine eligibility.

113. While Mr. Browning was at CSA, the question was presented as to whether the regulations required service plans for every case in the financial systems caseload. Mr. Browning developed the response from CSA which advised that it was not necessary to prepare a plan for every case in the financial systems caseload but only where service was needed. This advice was widely distributed to regional offices. Mr. Browning believed that service plans as required by the regulations were not intended to restrict but rather to encourage the delivery of services to eligible persons. There was never a problem of states delivering services to persons not in need of them.

114. Michio Suzuki is the Acting Commissioner of CSA and has been with CSA since May 1972. Prior to that time for many years he was involved with the social services program in California and before that worked with voluntary social services agencies. Mr. Suzuki testified to his understanding that eligibility determinations had to be made before or concurrent with the delivery of service. He described the practice of determining eligibility for services in California, indicating that the determination typically would not be completed until after services had commenced. During his service in California, no question of the timing of eligibility determinations or the use of sampling to determine eligibility ever arose. He first became aware of the sampling question when it was discussed in the CSA in the summer of 1972. On August 15, 1972, he instructed regional officials that they should not in any way rely upon or utilize advice in a memorandum issued August 11, 1972, which for the first time had set forth a prohibition on the use of sampling methods to determine eligibility. An action memorandum on February 12, 1973, to the Under Secretary, prepared by or under the direction of Mr. Suzuki, described the addition of the prior eligibility determination requirement as one of a number of major changes in the proposed regulations from previous versions of the regulations. Mr. Suzuki was not asked to express an opinion on the provisions of the Twiname memorandum here in issue.

115. Ray Myrick, Jr. is the Assistant Regional Commissioner in Region VIII. He has been regional official since 1968. His career is in public welfare. Mr. Myrick testified that no specified format was required of states for service plans. In his

view it was sufficient if notations in the record showed that recipients' needs had been considered and that service had been rendered to meet them. He testified that the goal of a service program may develop over a period of time and that the service plan was a matter of subjective interpretation based on caseworker's evaluation of the overall situation.

116. Between 1970 and 1972, Region VIII on several occasions advised its states that social studies were not necessary in connection with service plans and that it was sufficient to identify the goal of service and to offer services in support of that goal. Region VIII also advised its states on methods for extending services to persons in the former and potential categories. It was his understanding that the requirements of the Twiname memorandum concerning the time of eligibility determinations were not new. However, to his knowledge, no question of this kind had ever arisen in Region VIII; no state in Region VIII proposed the use of sampling to determine eligibility; and none ever proposed to make a retroactive services claim.

117. Virginia Smyth has been the Regional Commissioner for Region IV since 1967. She has been an employee of the federal government since 1960 and her educational background is in social work. Mrs. Smyth concurred in the testimony of Mr. Myrick concerning service plans. She confirmed that no format for service plans was required of the states and that state practice varied widely. She explained that the service plan was a fluid concept and that variations in the services utilized to achieve an objective on behalf of recipients would be considered part of the service plan even though not specified in the plan. It was her understanding that the eligibility determination process had to be initiated at or prior to the delivery of service and that the provisions of the Twiname memorandum concerning eligibility determinations were not new. She approved the use of sampling to determine eligibility, twice in the case of Florida and later in the case of South Carolina, the only states to propose the use of

sampling in Region IV. Apart from these cases, no issue of the time of eligibility determinations ever arose to Mrs. Smyth's knowledge. A general primer of eligibility requirements distributed by Region IV to its states in 1972 did not mention a prior eligibility determination requirement. Mrs. Smyth has long held the view that federal services funding was available if states provided eligibility services to eligible people as described in the approved state plan.

118. Thelma Thompson is a program specialist in Region V. She has been with HEW since 1962 and has served in various capacities in the Region V office. She has been involved in social work all her professional life. Mrs. Thompson generally agrees with the testimony on service plans given by Mr. Myrick and Mrs. Smyth and the other defense witnesses. She stated that in her experience service plans are eventually recorded in order to provide a record of services actually rendered and also to show that the services rendered were specified in the state's approval plan. She did not believe that the eligibility determination requirements of the Twiname memorandum were new and that sampling was not a permissible means of determining eligibility. However, Mrs. Thompson was familiar with the proposals in the States of Michigan, Minnesota and Illinois for use of sampling to determine eligibility. She was aware of the approval of sampling given by the Regional Commissioner to Illinois. She was aware of the discussions with the States of Michigan and Minnesota over an extended period of time and the fact that the central office advice on the use of sampling in these stages had been sought but not received prior to the Twiname memorandum. Apart from these sampling questions, no issue of timing of eligibility determinations ever arose and Mrs. Thompson never had occasion to seek central office advice on this question.

119. Edward J. Sienicki has been Deputy Regional Commissioner for State Programs for Massachusetts in Region I since November 1971. Prior to that time and from June 1968, he served as Deputy Re-

gional Commissioner in Region V. Part of that time he held a variety of positions in HEW and in county welfare agencies. Mr. Sienicki testified that in his opinion the eligibility determination requirements of the Twiname memorandum were not new. He testified that Region I had a firm position well before the Twiname memorandum that sampling could not be used to determine eligibility. Yet he was unaware of the approval given by the Region I Commissioner for Rhode Island's use of sampling and was unaware of the consideration given by the Region to Connecticut's sampling proposals. Although he testified that he unequivocally informed Massachusetts on the first day of his service in Region I that HEW policy firmly prohibited the use of sampling to determine eligibility and that Massachusetts could not use that method, he was aware that the Regional Commissioner in Region V had shortly before approved the use of sampling by Illinois. Moreover, Massachusetts was subsequently advised by regional officials that there was no firm federal policy concerning the use of sampling and that the state should proceed to prepare its methodology in whatever manner it deemed most reasonable. Although there was considerable correspondence between HEW and Massachusetts on its proposed methodology, which included sampling, there is no suggestion in the correspondence that sampling was prohibited. Although Mr. Sienicki testified that he was the "alter ego" of the Regional Commissioner in Region V and responsible for the development of all SRS programs in the Region, he claimed to be unaware of the proposals of Michigan, Minnesota and Wisconsin to utilize sampling methods for determining eligibility which were pending during his tenure in Region V.

## CONCLUSIONS OF LAW

1. The requirements of Issues 4 and 5 of the Twiname memorandum concerning the determination of eligibility, service plans, and the time of establishment of accounting methods and cost allocation plans are new requirements that did not exist prior to the date of its issue, December 20, 1972, in that:

a) Prior thereto, states qualified for federal service funds if they provided services described in an approved state plan to eligible people on or after the specified effective date of the plan;

b) Prior thereto, no requirement existed that eligibility for services be determined at or prior to the delivery of service;

c) Prior thereto, sampling was not prohibited as a method of determining eligibility for service;

d) Prior thereto, in cases where service planning was required, federal financial participation was not confined to services prescribed in service plans, nor was it required that services be pursuant to service plans which had to be recorded in any form before services were provided.

e) Prior thereto, states were permitted to reconstruct claims for federal service funds where the claims were not made at the time the service was provided, and were permitted to receive funds to the extent that service as described in its approved plan had been provided to eligible people.

f) Prior thereto, there was no requirement that accounting methods, including cost allocation plans, be established and in place during the period to which a claim for federal funds related. Nor was it required that the calculations used to determine expenditures eligible for federal participation be based on data applicable to the period to which a particular claim related.

2. The requirements of Issues 4 and 5 of the Twiname memorandum were invalidly adopted and are null and void, and of no legal effect, having been promulgated without compliance with the procedural requirements of Section 4 of the Administrative Procedure Act, made applicable to all HEW rulemaking relating to "public property, loans, grants, benefits or contracts" 36 Fed. Reg. 2536 (Feb. 5, 1971).

3. Plaintiffs are entitled to have their claims for service funds under the Social Security Act processed expeditiously without regard to Issues 4 and 5 of the Twiname memorandum or the requirements set

forth therein and in accordance with the applicable standards prior to the adoption of the Twiname memorandum criteria.

### FINAL JUDGMENT

This case having come on for trial, and the parties having had full opportunity to submit evidence on the issues at trial, and to be heard on the legal issues, and the Court having considered the entire record and all briefs, memoranda and arguments of the parties, it is hereby finally AD-JUDGED, DECREED, DECLARED and ORDERED:

A. The Court DECLARES that

1. It has jurisdiction to consider this case and to enter this final judgment.

2. The criteria set forth in Issues 4 and 5 of the Memorandum to Regional Commissioners from the Administrator, Social and Rehabilitation Service, United States Department of Health, Education and Welfare (HEW), dated December 20, 1972 (the Twiname Memorandum) were invalidly adopted and enunciated, are null and void, and of no legal effect, and cannot be utilized as a basis for denying, disallowing, deferring, or otherwise failing expeditiously to honor and accept any claims of states, including those now pending or previously acted upon, for federal financial participation in expenditures for social services under the Social Security Act.

3. Claims of states for federal financial participation in expenditures for social services under the Social Security Act for periods up to September 30, 1975, are entitled to be honored and processed to payment to the extent they are for services as described in an approved state plan to persons eligible therefor under the approved state plan from or after the effective date of the plan, provided that other relevant requirements expressly set forth in applicable published regulations and normally applied to state claims for social services funds prior to the release of the Twiname memorandum are substantially met.

4. Plaintiffs are entitled to expeditious processing to completion, including recon-sideration, of their pending claims for social services funds that have been disallowed, denied or deferred by HEW, in whole or in part, on the basis of Issues 1, 4, 5 or 7 of the Twiname memorandum, or of criteria substantially similar to those contained in these portions of the Twiname memorandum.

B. Defendants, their successors in office, and all those acting in consort with, under, or pursuant to the direction or control of defendants or their successors, are hereby ENJOINED from:

1. Applying the criteria of the Twiname memorandum in any manner contrary to or inconsistent with paragraph A(2) above.

2. Processing or otherwise acting or failing to act with respect to claims of plaintiffs under the Social Security Act for federal financial participation in services expenditures in any manner contrary to or inconsistent with paragraphs A(3) and A(4) above.

C. All costs are awarded to plaintiffs.